Steve **RITCHIE** and Anita
Ritchie, Respondents,

v.

**ALLIED PROPERTY & CASUALTY
INSURANCE COMPANY,**
Appellant.

No. SC 90085.

Supreme Court of Missouri,
En Banc.

Nov. 17, 2009.

Jared Robertson, Brian D. Malkmus, Springfield, MO, for Appellant.

Glen R. Gulick, Jr., Joplin, MO, for Respondents.

Jason L. Call, Carson & Coil, P.C., Jefferson City, MO, for Amicus Curiae Missouri Insurance Coalition.

Leland F. Dempsey, Ashley L. Baird, Dempsey & Kingsland, P.C., Kansas City, MO, for Amicus Curiae Missouri Association of Trial Attorneys.

LAURA DENVIR STITH, Judge.

Steve and Anita Ritchie sued Allied Property and Casualty Insurance Company seeking $300,000 in underinsured motorist coverage under their Allied policy for the wrongful death of their daughter, Kelsey Ritchie. The trial court held that the Ritchies were entitled to recover this amount, finding the anti-stacking and set-off provisions of the policy unenforceable.

This Court affirms, but on different grounds. Allied's other insurance provi-

sion states that where the insured was injured while in a non-owned vehicle, then "[a]ny coverage we provide ... shall be excess over any other collectible underinsured motorist coverage." This clause reasonably can be interpreted to permit stacking of underinsured motorist coverages where, as here, the insured was injured while in a non-owned vehicle. To the extent that other provisions of the policy could be read in isolation to prohibit such stacking, they at best create an ambiguity that, under settled law, must be resolved in favor of coverage. Similarly, this Court rejects Allied's argument that it is always entitled to a set-off for the amounts received by the insured from third parties. As this Court recently noted in *Jones v. Mid–Century Ins. Co.*, 287 S.W.3d 687 (Mo. banc 2009), such an interpretation in effect would mean that Allied never would pay the full amount of its purported limits of liability and, so, would be in conflict with the policy's coverage provisions. Instead, applying *Jones*, the set-off provision in the policy is not applicable where, as here, the insureds' damages exceed the amount of coverage even after deduction of amounts previously paid by other parties.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Steve and Anita Ritchie are the parents of Kelsey Ritchie.[1] While Kelsey was a passenger in a vehicle driven by Noah Heath, it collided with a vehicle driven by Adam Tomblin. Numerous people were injured in the accident, and Kelsey was killed. Kelsey's parents sued both Mr. Heath and Mr. Tomblin for wrongful death. Following trial, a judgment was entered in favor of the Ritchies and against Mr. Heath and Mr. Tomblin (the

tortfeasors) for $1.8 million for the wrongful death of Kelsey. At the time of the accident, Kelsey was insured under a personal automobile policy the Ritchies purchased from Allied. The Allied policy insured three vehicles owned by the Ritchies. The Ritchies paid three separate premiums for these vehicles, including underinsured motorist coverage for each vehicle of $100,000 per person and $300,000 per accident.

Both Mr. Heath and Mr. Tomblin were underinsured. Mr. Heath's insurer, OMNI Hartford, provided liability limits of $25,000 per person and $50,000 per accident. Mr. Tomblin's vehicle was insured by Progressive Insurance Company, with liability limits of $50,000 per person and $100,000 per accident. Because these per accident liability limits had to be shared among the multiple persons injured in the accident, the Ritchies received only $20,000 from Mr. Heath's insurer and $40,000 from Mr. Tomblin's insurer toward their $1.8 million damage award. The Ritchies, therefore, sought recovery from Allied under their underinsured motorist coverage. They asserted that they were entitled to the full $100,000 per person underinsured coverage for each vehicle, for a total of $300,000.

Allied countered that its underinsured motorist policies could not be stacked, thereby permitting only a single recovery of up to $100,000. It further argued that "the maximum per-person recovery under the underinsured motorist coverage policy [of] $100,000" was not just the most it would pay, but was also the most that the Ritchies were entitled to recover in total from all sources. This meant, it argued, that it was entitled to a set-off of the

1. For the sake of clarity, the opinion hereafter will refer to Kelsey individually by her first name and to her parents as "the Ritchies."

$60,000 that the Ritchies already had recovered from the tortfeasors' insurers.

Believing that such a set-off was improper and that the language of their particular policy entitled them to stack the three underinsured motorist coverages, the Ritchies filed the instant suit. The trial court found that the anti-stacking and set-off provisions in the policy were "confusing, duplicitous, vague, ambiguous and inconsistent" and unenforceable and that the Ritchies were entitled to recover the full $300,000 of underinsured motorist coverage. Allied appeals. Following a decision by the court of appeals, this Court granted transfer. Mo. Const. art. V, sec. 10.

## II. STANDARD OF REVIEW

■■■ Interpretation of an insurance policy is a question of law that this Court determines *de novo*. *Seeck v. Geico General Ins. Co.,* 212 S.W.3d 129, 132 (Mo. banc 2007). "In construing the terms of an insurance policy, this Court applies the meaning which would be attached by an ordinary person of average understanding if purchasing insurance, and resolves ambiguities in favor of the insured." *Id.; Martin v. United States Fid. & Guar. Co.,* 996 S.W.2d 506, 508 (Mo. banc 1999). Such "ambiguity exists when there is duplicity, indistinctness, or uncertainty in the meaning of the language in the policy. Language is ambiguous if it is reasonably open to different constructions." *Seeck,* 212 S.W.3d at 132; *Gulf Ins. Co. v. Noble Broadcast,* 936 S.W.2d 810, 814 (Mo. banc 1997). Courts should not interpret policy provisions in isolation but rather evaluate policies as a whole. *Seeck,* 212 S.W.3d at 133.

## III. DISCUSSION

**A.  The Right to Stack Underinsured Motorist Coverage Is Determined by the Language of the Policy**

■■■ " 'Stacking' refers to an insured's ability to obtain multiple insurance coverage benefits for an injury either from more than one policy, as where the insured has two or more separate vehicles under separate policies, or from multiple coverages provided for within a single policy, as when an insured has one policy which covers more than one vehicle." *Niswonger v. Farm Bureau Town & Country Ins. Co. of Missouri,* 992 S.W.2d 308, 313 (Mo.App. 1999). Missouri law requires that all automobile insurance policies issued in this state provide *uninsured* motorist coverage of at least the statutory minimum amount of $25,000. § 379.203, RSMo 2000. Flowing from this statutory requirement, this Court has recognized that where multiple policies or multiple uninsured motorist coverages are in place, insurers are prohibited from including policy language precluding stacking of the coverage provided under multiple policies or coverage provisions. *Niswonger,* 992 S.W.2d at 313.

■■■ By contrast, and unlike many other states, Missouri statutes do not also mandate *underinsured motorist* coverage. *See 16 WILLISTON ON CONTRACTS, § 49.35 (4th ed. 2009)* (contrasting the requirements of various states in regard to underinsured motorist coverage). Consequently, "the existence of the [underinsured motorist] coverage and its ability to be stacked are determined by the contract entered between the insured and the insurer." *Rodriguez v. Gen. Acc. Ins. Co. of Am.,* 808 S.W.2d 379, 383 (Mo. banc 1991). This means that if the policy language is unambiguous in disallowing stacking, the anti-stacking provisions are enforceable. *Seeck,* 212 S.W.3d at 132. "If, however, policy language is ambiguous [as to stacking], it must be construed against the insurer," and stacking will be allowed. *Id.; Gulf Ins. Co.,* 936 S.W.2d at 814.

Here, all agree that the Ritchies suffered damages of $1.8 million, that they recovered $60,000 from the tortfeasors, and that each of the Ritchies had underinsured motorist coverage with Allied for the three vehicles in the amounts of $100,000 per person and $300,000 per accident. All agree that Kelsey died as a result of an accident while riding in a non-owned vehicle. All also agree this means that the Ritchies' damages exceed the $60,000 in damages they have been paid under the tortfeasors' insurance policies and that the Ritchies are entitled to recover some additional damages under their underinsured motorist coverage with Allied, which states in part:

**INSURING AGREEMENT**

A. We will pay compensatory damages which an "insured" is legally entitled to recover from the owner or operator of an "underinsured motor vehicle" because of "bodily injury"

    1. Sustained by an "insured;" and

    2. Caused by an accident.

    . . . .

We will pay under this coverage only if the limits of liability under any applicable bodily injury liability bonds or policies have been exhausted by payment of judgments or settlements.

    . . . .

### B. Ambiguities in Other Insurance and Limit of Liability Clause

The issue before this Court is the *amount* the Ritchies are owed and how that amount relates to possible conflicts *within* the other insurance provision and *between* the other insurance provision and the limit of liability provision. Allied argues that the limit of liability provision

prohibits stacking of underinsured motorist coverages, so that the total potential limit of its liability is $100,000. Allied further argues that the policy provisions entitle it to a $60,000 set-off from this total because the Ritchies already have recovered $60,000 from the tortfeasors' insurers. Therefore, Allied says, it owes the Ritchies only $40,000.

The Ritchies argue that even if the limit of liability provision could be so interpreted, the other insurance provision creates an exception and permits stacking where, as here, the insured was injured while riding in a non-owned vehicle. To the extent these policy provisions are inconsistent, they create an ambiguity that, under Missouri law, must be construed in favor of the insured. *Gulf Ins. Co.*, 936 S.W.2d at 814. The Ritchies further argue that as in *Jones*, 287 S.W.3d at 690–93, the set-off language is inconsistent with the coverage provision stating that $100,000 in coverage will be provided, for in fact Allied's corporate representative admitted that amount of coverage never will be provided and, so, creates an ambiguity that similarly must be resolved in favor of coverage.[2]

The pertinent language from the Allied policy on which both parties rely in support of these arguments is as follows:

**LIMIT OF LIABILITY**

A. *The limit of liability shown in the Declarations for each person for Underinsured Motorists coverage is our maximum limit of liability for all damages for case, loss of services, or death arising out of "bodily injury" sustained by any one person in any one accident. Subject to this limit for each person, the limit of liability shown in the Sched-*

---

**2.** The Ritchies also request that this Court consider particular wording as allowing them to recover $600,000 because there were two uninsured drivers involved in the accident.

The Ritchies did not cross-appeal in accordance with **Rule 81.04(b)**, however, and, so, no issue in this regard is presented for the Court to consider on appeal.

ule or in the Declarations for each accident for Underinsured Motorists Coverage is our maximum limit of liability for all damages for "bodily injury" resulting from any one accident. This is the most we will pay regardless of the numbers of:

1. "Insureds;"

2. Claims made;

3. Vehicles or premiums shown in the Declarations; or

4. Vehicles involved in the accident.

B. *The limit of liability shall be reduced by all sums: ... [p]aid because of 'bodily injury' or by or on behalf of persons organizations who may be legally responsible ...*

**OTHER INSURANCE**

*If there is other applicable underinsured motorists coverage available under one or more policies or provisions of coverage:*

1. *Any recovery for damages may equal but not exceed the highest applicable limit for any one vehicle under this insurance or other insurance providing coverage on either a primary or excess basis. In addition, if any such coverage is provided on the same basis, either primary or excess, as the coverage we provided under this endorsement, we will pay only our share. Our share is the proportion that our limit of liability bears to the total of all applicable limits for coverage provided on the same basis.*

2. *Any coverage we provide with respect to a vehicle you do not own shall be excess over any other collectible underinsured motorist coverage.*

(emphasis added in italics).

As the issues of stacking and set-off payments concern different subsections of the Allied policy, this Court will address each separately.

**C. The Other Insurance Clause Authorizes Stacking**

■ Considered in isolation, the limit of liability provision and clause (1) of the other insurance provision could be interpreted to prohibit stacking to the extent they state that the "limit of liability shown in the declarations for each person for Underinsured Motorists coverage is our maximum limit of liability" and that any recovery "may equal but not exceed the highest applicable limit for any one vehicle."

As noted earlier, however, courts should not interpret policy provisions in isolation but rather evaluate policies as a whole. *Seeck,* 212 S.W.3d at 133. Allied's proposed interpretation of the above two subsections is inconsistent with subsection (2) of the other insurance provision, which states that "[a]ny coverage we provide with respect to a vehicle *you do not own* shall be excess over any other collectible underinsured motorist coverage" (emphasis added).

Kelsey was injured while riding in a vehicle not owned by her or her parents. Subsection (2) of the other insurance provision, therefore, is applicable. As just quoted, this means the underinsured coverage under the policy "shall be excess over any other collectible underinsured motorist coverage" when, as in this case, an insured is injured while riding in a non-owned vehicle.

When subsection (2) is read together with the provisions in which Allied relies, the three subsections suggest "that the policy's anti-stacking provisions, which might normally and otherwise apply, do not apply in the special situation where the insured is injured while occupying a non-

owned vehicle." *Niswonger*, 992 S.W.2d at 315. Rather, an "ordinary person of average understanding," *McCormack Baron*, 989 S.W.2d at 171, reasonably could interpret this other insurance provision to mean that when an injured insured is occupying a non-owned vehicle and there are multiple underinsured motorist coverages, as it is conceded there are here, then each of the underinsured motorist coverages are excess to the other, and, therefore, may be stacked.

*Seeck* is directly on point. In that case, this Court followed a long line of precedent "holding that conflicts between underinsured motorist policy limits ... and the provision of excess coverage in an excess or other insurance clause renders an insurance policy ambiguous." 212 S.W.3d at

133. This Court found the interplay between a limit of liability provision and another insurance provision created ambiguity, as excess coverage was promised at one point and taken away at another. *Id.* This reasoning is directly applicable here.[3]

■ The Allied other insurance provision reasonably could be interpreted as superseding the limit of liability provision and making coverage available to the insureds through their own additional underinsured motorist coverages with Allied. *Niswonger*, 992 S.W.2d at 318.[4] Any conflict between these provisions creates an ambiguity that is resolved in favor of the insureds. *Chamness v. Am. Family Mut. Ins. Co.*, 226 S.W.3d 199, 207 (Mo.App. 2007).[5]

3. Specifically, *Seeck* held that ambiguity existed in an insurance policy containing the following other insurance provision:

> When an insured is occupying a motor vehicle not owned by the insured ... this insurance is excess over any other insurance available to the insured and the insurance which applies to the occupied motor vehicle is primary.

212 S.W.3d at 132. *Accord, Goza v. Hartford Underwriters Insurance Co.*, 972 S.W.2d 371, 374–375 (Mo.App.1998) (conflicts between a similar other insurance provision and limit of liability provision "might reasonably be interpreted by an average lay person ... to mean that [the other insurance provision] prevailed over the preceding and apparently conflicting language contained in the policy's ... Limits of Liability sections ..."); *Ware v. Geico Gen. Ins. Co.*, 84 S.W.3d 99, 103 (Mo.App.2002) ("[A] reasonable layperson may have concluded that the 'Other Insurance' provision prevailed over the preceding and apparently conflicting 'Limit of Liability' provisions in that the 'Other Insurance' provision applies to a specific situation setting it apart, namely, when an insured is occupying a motor vehicle not owned by the insured ..."). *See also Lutsky v. Blue Cross Hosp. Serv., Inc.*, 695 S.W.2d 870, 875 (Mo. banc 1985); *Am. Family Mut. Ins. Co. v. Ragsdale*, 213 S.W.3d 51, 54 (Mo.App.2007); *Zemelman v. Equity Mut. Ins. Co.*, 935 S.W.2d 673, 677–78 (Mo.App. 1996).

4. While, as Allied notes, *Niswonger*, 992 S.W.2d at 316, found that the use of the word "however" before the excess clause for non-owned vehicles furthered the impression that it set out an exception to the anti-stacking rule, Allied misapprehends the power of conjuncts. *Niswonger* nowhere suggested that simply removing the word "however" by itself would eradicate all contradictions between the two provisions. Conjuncts, after all, are not part of the propositional content but rather are a way of linking a sentence with previous discourse. Where clauses conflict, it is up to the insurer to correct the contradiction through clear, ordinary language. *Seeck*, 212 S.W.3d at 134, fn. 3. An ambiguity has been found even in the absence of such words of exclusion, *see, e.g., Seeck*, 212 S.W.3d at 132, and this Court again so finds here.

5. The dissent suggests that *Seeck* was wrongly decided and that this Court should read limitation of liability clauses completely independently of other insurance clauses, thereby avoiding the ambiguity present here and in *Seeck* of one clause seemingly giving coverage while another excludes it. As noted above, however, Missouri has long followed the rule that an insurance policy must be read as a whole, not provision by provision. Although insurers often seek to have courts interpret each provision independently, that is not consistent with Missouri's long-standing ap-

Allied attempts to distinguish its other insurance provision from that in *Seeck* by noting that the provision in *Seeck* said coverage was "excess over *any other* insurance," whereas here, Allied's policy says coverage is excess over "*any other* collectible *underinsured* motorist coverage." While this difference in language might be dispositive in some other fact situation,[6] Allied fails to note that in the present matter the Ritchies, in fact, are claiming the coverage is excess over other collectible *underinsured* motorist coverage. As such, **Seeck's** reasoning is fully applicable.[7]

This also distinguishes *Farm Bureau Town & Country Ins. Co. of Mo. v. Barker*, 150 S.W.3d 103, 108 (Mo.App.2004), the key case on which Allied relies. While the other insurance provision in *Barker* states that any insurance with respect to a non-owned vehicle will be "excess" over "primary" coverage provided by insurance that applies to the occupied motor vehicle, the Allied policy provides "excess" coverage over "*any other* collectible underinsured motorist coverage." In this way, the language in the Allied policy is more likely to create the impression that underinsured motorist coverages can be stacked when injury occurs in a non-owned vehicle. In any event, no other court has cited *Barker* in any of the numerous underinsured motorist decisions since it was handed down. To the extent *Barker* is inconsistent with *Seeck* and the cases *Seeck* cites with approval, it no longer should be followed.[8]

### D. Allied Is Not Entitled to a Set-off

■■■ Allied argues that, regardless of whether this Court accepts its argument as to stacking, it is entitled to a $60,000 set-off against the total liability it owes the Ritchies because that is the amount the Ritchies already have collected from the tortfeasors' insurers.[9] In support, Allied

proach. *Seeck* is only the latest case to apply this rule to a situation such as this where the other insurance clause appears to provide coverage that the limitation of liability clause is argued to prohibit; any resulting ambiguity will be construed against the insurer. *See* cases cited in notes 3, 4, 6 and 7 herein.

6. *See Niswonger* 992 S.W.2d at 315 ("While the [underinsured motorist] 'anti-stacking' provisions of the policy here in question might perhaps have to be deemed unambiguous in nearly any other factual situation, that does not necessarily mean they are unambiguous in the particular factual situation now before us . . .").

7. *See also Ragsdale*, 213 S.W.3d at 56; *Niswonger*, 992 S.W.2d at 315 ("[A] reasonable lay person could interpret the sentence to specifically *allow* stacking of [underinsured motorist] coverages provided in their separate vehicle policies, for which separate [underinsured motorist] premiums have been paid, *in the special situation where an accident occurs while the insured is occupying a non-owned vehicle*.").

8. In fact, a prior version of the Allied policy *did* use language more similar to that in *Barker*, stating:

  A. Any recovery for damages *under all such policies or provisions of coverage* may equal, but not exceed, the highest applicable limit for any one vehicle under any insurance providing coverage on either a primary or excess basis.

  B. Any insurance we provide with respect to a vehicle you do not own shall be excess over any collectible insurance providing coverage *on a primary basis*.

Here, of course, the Ritchies argue that the Allied policies can be stacked because they say they provide excess coverage over other collectible underinsured motorist coverage, not over other primary coverage, so *Barker* is not on point.

9. In support of this argument, Allied cites to *Green v. Federated Mut. Ins. Co.*, 13 S.W.3d 647, 648–649 (Mo.App.1999), in which the court of appeals held no conflict, and, therefore, no ambiguity, existed between an other insurance provision and a limit of liability provision. *Green* found that a change in the insurer's other insurance clause eliminated a conflict noted in prior cases between that

points the Court to subsection B of the limit of liability provision, which states in relevant part that the "limit of liability shall be reduced by all sums . . . [p]aid because of 'bodily injury' or by or on behalf of persons organizations who may be legally responsible. . . ."

A nearly identical argument recently was rejected by this Court on similar facts in *Jones*, 287 S.W.3d at 691. The policy in that case said "[t]he amount of UNDERinsured Motorist Coverage we will pay shall be reduced by any amount paid or payable to or for an insured person." Considered in isolation, this clause could be read to permit the insurer to set off the amount already received from others from the amount stated in its limit of liability. But, *Jones* noted, if a contract "promises something at one point and takes it away at another, there is an ambiguity . . . [and if] policy language is ambiguous, it must be construed against the insurer." 287 S.W.2d at 690, *quoting Seeck*, 212 S.W.3d at 132.

*Jones* held that such an ambiguity was present in that case because the set-off provision on which the insurer relied conflicted with the clear statement in other portions of the policy that the stated limit of liability was "the most we will pay" and that "we will pay up to the limits of liability shown in the schedule." *Id.* at 690–91. Yet because the provision at issue provided *underinsured* motorist coverage, not *uninsured* motorist coverage, the insured always would have recovered at least the statutorily required amount of coverage. Therefore, the insurer never would pay out the full amount of its stated limits of liabil-

ity, making its statements that it would do so misleading.

*Jones* resolved this conflict by giving an alternative construction to the limit of liability provision that would give meaning to all policy provisions without conflict. It found the statement that underinsured motorist coverage would be "reduced by any amount paid or payable to or for an insured person" simply to mean "that in determining the total damages to which the underinsured motorist coverage will be applied, the amount of money already received from the tortfeasor must be deducted." *Id.* at 693. The provision, therefore, precludes a double recovery—one recovers the policy limits only if, after deducting the amounts already paid, damages equaling or exceeding those limits are still outstanding.

This analysis applies directly here. Both the declarations page for the policy and the limit of liability provision state that coverage is provided up to $100,000 per person, $300,000 per accident, for each of the three vehicles the Ritchies owned and, in multiple places, states that "this is the most we will pay" and that this limit of liability is the maximum it will pay. Yet, as Allied's corporate representative conceded below, Allied in fact never will pay out its full amount under its interpretation of "limit of liability" subsection B. It always will be reduced by the amounts already paid, even where, as here, the plaintiffs still had $1.74 million in damages unpaid.

Subsection B does not cure or avoid this coverage language, but, if interpreted as Allied requests, subsection B does conflict with it. And as previously noted, it is

clause and the limit of liability clause regarding set-off. 13 S.W.3d at 648. *Green* did not address the separate ambiguity found in *Jones*, 287 S.W.3d at 689, between the provision promising coverage limits of liability of

$100,000 when the policy in fact would not pay out that amount due to the set-off provisions. As the Ritchies rely on the *Jones* analysis, *Green* is not helpful to the set-off issue's determination in this case.

well-settled that where one section of an insurance policy promises coverage and another takes it away, the contract is ambiguous. *Seeck,* 212 S.W.3d at 133.

As in *Jones,* however, an alternative construction can be placed on subsection B giving meaning to all subsections of the policy.[10] In stating that "[t]he limit of liability shall be reduced by all sums . . . [p]aid because of 'bodily injury' or by or on behalf of persons or organizations who may be legally responsible," subsection B "simply means that in determining the total damages to which the underinsured motorist coverage will be applied, the amount of money already received from the tortfeasor must be deducted. In this way, it avoids a double recovery." *Jones, id.* at 693. As applied to this case, this means that if the Ritchies had suffered only $140,000 in damages and had recovered $60,000 from other tortfeasors, then the $60,000 would be deducted from the total damages, and Allied would be responsible for only the remaining $80,000, thereby avoiding a double recovery. In fact, this is how Allied's own adjuster interpreted the policy, stating that Allied's own web site declared "this coverage typically pays the difference between the amount recovered from the other driver and the amount of the damages, up to the limit of the policy," and that this definition applied to the Ritchies' policy.

Applying these principles here, the Ritchies suffered $1.8 million in damages, and received only $60,000 from the tortfeasors.

Deducting this $60,000 from the $1.8 million in damages still leaves unsatisfied damages of $1.74 million. This is far more than the policy limits. Accordingly, Allied must pay its full policy limits of $300,000.

## IV. CONCLUSION

For all the reasons stated above, the circuit court's judgment is affirmed.

TEITELMAN, RUSSELL, WOLFF, BRECKENRIDGE and FISCHER, JJ., concur.

PRICE, C.J., dissents in separate opinion filed.

WILLIAM RAY PRICE, JR., Chief Justice, dissenting opinion.

Steve and Anita Ritchie brought a claim under their Allied insurance policy for the death of their daughter. She was a passenger in a car driven by Noah Heath that collided with a car driven by Adam Tomblin. Although the Richies obtained a judgment against Mr. Heath and Mr. Tomblin in the amount of $1.8 million, they only recovered $60,000 because both were underinsured. Accordingly, the Ritchies brought a claim against their insurer Allied for underinsured motorist coverage (UIM). The Ritchies had one policy from Allied that covered each of their three vehicles with a maximum $100,000 of liability for injuries per person. Their policy also had an anti-stacking provision and a limit of liability provision that read:

---

10. The dissent is incorrect in characterizing this opinion as holding that limitation of liability clauses are never enforceable. A policy that plainly states it only will pay the difference between the amount recovered from the underinsured motorist and $100,000 is enforceable. In such a case, the mere fact that $100,000 will never be paid out is not misleading, for the policy never suggests that this is its liability limit and never implies that it may pay out that amount. That is not the case here, however. The policy says it provides $100,000 in underinsured motorist coverage but, in fact, under the insurer's interpretation of the policy, it will never pay that amount. That creates an ambiguity resolved by giving the language on which the insurer relies an alternative interpretation that will give effect to all of the policy provisions, as the Court holds above and as it held in *Jones,* 287 S.W.3d at 690.

A. The limit of liability shown in the Declarations for each person for Underinsured Motorists coverage is our maximum limit of liability for all damages for case, loss of services, or death arising out of "bodily injury" sustained by any one person in any one accident . . . This is the most we will pay regardless of the numbers of:

1. "Insureds;"

2. Claims made;

3. Vehicles or premiums shown in the Declarations;

or

4. Vehicles involved in the accident.

B. The limit of liability shall be reduced by all sums: . . . [p]aid because of 'bodily injury' or by or on behalf of persons organizations who may be legally responsible . . .

The majority refuses to give effect to these provisions for two reasons. First, they argue that they conflict with the "other insurance" excess clause in the policy which reads:

> Any coverage we provide with respect to a vehicle you do not own shall be excess over any other collectible underinsured motorist coverage.

Second, the majority takes issue with the limit of liability language of the policy, arguing that because the UIM policy will never pay out its absolute limit, it is misleading and ambiguous. I disagree with both points. The majority creates ambiguities where none naturally arise. I would enforce the anti-stacking and limit of liability provisions.

## I. Ambiguities in Insurance Contracts

An ambiguity arises when there is duplicity, indistinctness or uncertainty in the meaning of the words used in the contract. *Nixon v. Life Investors Insurance Co.*, 675 S.W.2d 676, 679 (Mo.App.1984). When interpreting that agreement, a court cannot create an ambiguity where none exists to enforce a particular construction that it might feel is more appropriate. *Rodriguez v. Gen. Acc. Ins. Co. of Am.*, 808 S.W.2d 379, 382 (Mo. banc.1991). Where insurance policies are unambiguous, they will be enforced as written absent a statute or public policy requiring coverage. *Hempen v. State Farm Mutual Automobile Insurance Co.*, 687 S.W.2d 894, 894 (Mo. banc 1985).

## II. The Anti–Stacking and "Other Insurance" Clauses Do Not Conflict and Do Not Create an Ambiguity

An anti-stacking clause and an "other insurance" clause are two distinct insurance policy provisions that address different subject matters.

An anti-stacking clause prohibits the insured from collecting on multiple coverage items or policies from the same insurer for a single accident. In effect, it makes only one policy or coverage amount collectable. *See Noll v. Shelter Ins. Companies*, 774 S.W.2d 147 (Mo.1989); *see also Couch on Insurance*, § 169:4 (3d. ed. 2005). An anti-stacking clause will be upheld if it is unambiguous. *Rodriguez v. General Acc. Ins. Co. of America*, 808 S.W.2d 379, 383 (Mo. banc 1991). This Court already upheld essentially the same anti-stacking clause as Allied's as unambiguous and enforceable as a matter of law in *Rodriguez*, 808 S.W.2d at 381.[1]

---

1. The clause in *Rodriguez* read:
LIMIT OF LIABILITY
A. The limit of liability shown in the schedule for this coverage is our maximum limit of liability for all damages resulting from any one accident. This is the most we will pay regardless of the number of:
1. "Insureds";
2. Claims made;

"Other insurance" provisions are different in subject matter, but also are enforced as written under Missouri law. *Distler v. Reuther Jeep Eagle,* 14 S.W.3d 179, 183 (Mo.App.2000); *MFA Mut. Ins. v. American Family Mut. Ins.,* 654 S.W.2d 230, 233 (Mo.App.1983). They address situations in which different insurers have issued policies that cover the same event. *Planet Ins. Co. v. Ertz,* 920 S.W.2d 591, 593 (Mo.App.1996) ("'Other insurance' clauses are provisions inserted in insurance policies to vary or limit the insurer's liability when additional, concurrent insurance exists to cover the same loss.")

The type of "other insurance" clause here is an excess clause that makes the policy "payable after other policies." *Id.* Historically when our courts have addressed the operation of "other insurance," it was to resolve conflicts between multiple insurers over which insurer must pay in what order.[2]

Only recently, in *Seeck v. Geico General Ins. Co.,* 212 S.W.3d 129 (Mo. banc 2007), has this Court turned these outward-looking provisions inward toward the internal operation of a single policy's language.[3] This approach misconstrues how courts, insurance carriers and insureds have traditionally interpreted "other insurance" provisions to apply.

The use of an "other insurance" clause and an anti-stacking clause in a policy is neither conflicting nor ambiguous. "'Other insurance' clauses address rules for determining responsibility *if more than one coverage is considered to apply,* while stacking addresses whether more than one coverage which would otherwise be applicable *should, in fact, be applied at all.*" *Couch on Insurance,* § 169:9 (3d. ed. 2005) [emphasis added]. As other jurisdictions have noted, "other insurance" clauses are "entirely unilluminating in deciding the question of whether more than one policy applies." *Goetz v. American Reliable Ins. Co.,* 844 P.2d 366, 370 (Utah App.1992); *Mississippi Farm Bureau Cas. Ins. Co. v. Britt,* 826 So.2d 1261, 1264 (Miss.2002). This is the question reached by the anti-stacking clause.

Here, Allied's anti-stacking clause applied. Although the Ritchies' policy covered these vehicles, it allowed recovery of only one limit. Because there were no "other collectible underinsurance policies," the "other insurance" clause was not triggered. There is no conflict between these two provisions, and both can plainly be read together. This Court should enforce them as written.

### III. The Limit of Liability Provision is Enforceable

The majority also argues that because "Allied will never in fact pay out the full amount" of the policy limit, the contract purports to give something (the $100,000 limit) and then take it away (with a set-

3. Vehicles or premiums shown in the Declarations; or
4. Vehicles involved in the accident. *Rodriguez,* 808 S.W.2d at 381.

Another court commenting about the text of the *Rodriguez* provisions noted, "[i]t is hard to imagine clearer language." *Grinnell Select Ins. Co. v. Baker,* 362 F.3d 1005, 1006 (7th Cir.2004). That court went on to further note that in almost all 50 state jurisdictions, that provision is universally enforced. *Id.*

2. *See e.g. Arditi v. Massachusetts Bonding & Insurance Co.,* 315 S.W.2d 736 (Mo.1958); *State Farm Mutual Automobile Insurance Co. v. Western Casualty and Surety Co.,* 477 S.W.2d 421 (Mo. banc 1972); *Planet Ins. Co. v. Ertz,* 920 S.W.2d 591 (Mo.App.1996); *Crown Center Redevelopment Corp. v. Occidental Fire & Casualty Co.,* 716 S.W.2d 348 (Mo. App.1986).

3. I did not participate in the *Seeck* decision. *Seeck* departed from established Missouri law.

off), which creates an ambiguity. The Eighth Circuit made the same argument when interpreting a Missouri UIM insurance contract in *Weber v. American Family Mutual Insurance Co.*, 868 F.2d 286, 288 (8th Cir.1989). The policy in *Weber* provided for a maximum $50,000 payout for bodily injuries sustained in an accident. *Id.* Then, the liability insurance of the underinsured tortfeasor was deducted from that amount. *Id.* The Eighth Circuit argued that:

> [I]f the tortfeasor's insurer paid $25,000, then the insured would be paid $25,000 on her underinsured motorist coverage; and if the tortfeasor's insurer paid one dollar then the insured would receive $49,999 from her own coverage. Never could the insured recover the full $50,000 in underinsured motorist benefits ... [which] rendered the coverage meaningless. *Rodriguez v. General Acc. Ins. Co. of America*, 808 S.W.2d 379, 383 (Mo.1991) (summarizing *Weber*, 868 F.2d at 288)

This Court explicitly rejected *Weber* in *Rodriguez*, saying that this analysis was "inconsistent with Missouri law" and "an example of a court creating an ambiguity in order to distort the language of an unambiguous policy." *Rodriguez*, 808 S.W.2d at 383 (Mo.1991). An underinsurance policy is not illusory or ambiguous because of "mathematical inability to collect [the] full ... underinsured motorist coverage." *Id.* at 383 n. 1. "The effect of underinsured motorist coverage is to assure the [insured] of receiving ... the contracted amount of protection," in the present case $100,000 total. *Id.* Under *Rodriguez*, this limit of liability clause must be given effect and enforced as written.

The majority cites to *Jones v. Mid–Century Ins. Co.*, 287 S.W.3d 687 (Mo. banc 2009), as authority that a mathematical inability to collect the full policy amount renders an underinsured policy illusory and ambiguous. *Jones* is not so broad.

The *Jones* policy was drafted deficiently. It read:

> [T]he most we will pay will be the lesser of:
> 1. The difference between the amount of an insured person's damages for bodily injury, and the amount paid to that insured person by or for any person or organization who is or may be held legally liable for the bodily injury; or
> 2. The limits of liability of this coverage. *Id.* at 690.

This Court noted that the drafter had omitted the phrase "minus the amount already paid to that insured person" from the end of the second alternative. *Id.* at 691. Without this phrase, the plain meaning of the *Jones* policy seemed to promise a full amount. *Id.* The holding in *Jones* was specific to the deficient drafting of the policy that created a promise to pay the full amount. *Id.* It cannot be read as general adoption of a rule prohibiting limits of liability clauses.

## IV.  Conclusion

The plain meaning of Allied's policy prohibited stacking of the coverage items and required a set-off for insurance already collected. Mr. Heath's and Mr. Tomblin's insurance policies had already paid out $60,000. Allied's policy guaranteed that it would bring the Ritchies' total recovery to $100,000. Thus, the proper recovery should be $40,000.

I sympathize with the Ritchies' loss. Neither $300,000 nor $60,000 will come close to compensating them for that loss. But, the majority's decision will have effects that reach further than the Ritchies. The majority decision increases by more

than threefold the risk the insurance company intended to cover with this type of policy for all of its insureds. This will inextricably lead to a commensurate premium increase for all Missourians. Moreover, if insurance companies cannot write their policies with confidence that our courts will enforce their plain language, that risk will also have to be priced into our policies.

By creating ambiguities and enlarging coverage, the majority precludes insurance companies from competing in terms of coverage and price and forces higher insurance cost for all of us.

For the foregoing reasons, I respectfully dissent.